UNITED STATES DISTRICT COURT OF NEW HAMPSHIRE

|  |  |
|---|---|
| A.V., a minor, by and through his mother and next friend, N.V.,<br>      Plaintiff<br><br>v.<br><br>DRESDEN SCHOOL DISTRICT,<br>SCHOOL ADMINISTRATIVE UNIT 70,<br>and JUSTIN CAMPBELL, Principal of<br>Hanover High School, in his individual and<br>official capacity,<br>      Defendants | Civil No. 1:17-CV-00560-PB |

**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

## I.      INTRODUCTION

All public schools have an ongoing duty of reasonable supervision of the students in their charge.  When school districts and its administrators are made aware of ongoing student-on-student sexual harassment in their schools, they also have an obligation, under both Title IX and state common law, to investigate all complaints, take reasonable steps to stop the harassment, prevent reoccurrence and address the harm incurred.  Moreover, when school districts learn that the steps they have taken were inadequate in preventing further sexual harassment, they are required to take further reasonable action in light of the known circumstances.   If they fail to take these steps, then they will be deemed to have acted with "deliberate indifference" to the known acts of sexual harassment and will be liable for the resulting injuries.

In this case, the Plaintiff A.V. and his family repeatedly complained of incidents of sexual harassment by multiple students against A.V. during the course of A.V.'s freshman year at Hanover High School. These complaints included, but were not limited to, students calling

1

A.V. names such as "Little Dick," "Little D.," "pussy," and "faggot;" a student drawing penises on the back of his boots; a student creating and hanging up a poster with his manipulated image on it as part of a school project; and being physically assaulted on three occasions.  However, the Defendants did not take appropriate steps to investigate the reported incidents, protect A.V., or take appropriate actions to prevent future incidents.  As a result, the sexual harassment continued and, eventually, A.V. was placed on medical leave due to the injuries he suffered during the last assault.  Ultimately, A.V.'s family requested to have him reassigned to another school, which the Superintendent agreed would be in his best interest.

## II.     PARTIES

1. The Plaintiff, A.V., is a fifteen (15) year old minor and is a resident of the Town of South Burlington, VT. At all relevant times, A.V. was a resident of the Town of Hanover and a student at Hanover High School.  As a result, the Dresden School District and School Administrative Unit 70 were responsible for providing him with an education under federal and state law.  A.V. appears by his mother and next friend N.V. (hereinafter "the Mother").

2. The Defendant, Dresden School District (hereinafter "Dresden") is a public school district organized under the laws of the State of New Hampshire and a governmental subdivision of the State of New Hampshire, located in Hanover, New Hampshire.  Dresden is responsible for providing public education to all middle school and high school students residing within its boundaries.  High School students within its boundaries attend Hanover High School.  As a public school district, Dresden owes a duty of reasonable supervision to each of its students, including A.V.  It is also a recipient of federal funds and is responsible for complying with all aspects of Title IX.  Dresden is being sued both directly and also

based upon a claim of respondeat superior or vicarious liability for the unlawful conduct of Justin Campbell, Principal of Hanover High School.

3. The Defendant, School Administrative Unit 70 (hereinafter "SAU 70") is a school administrative unit organized under the laws of the State of New Hampshire and is a governmental subdivision of the State of New Hampshire. It is comprised of three school districts, including the Dresden School District, and is located in Hanover, New Hampshire.  SAU 70 is responsible for providing public education to the children residing within its boundaries.  As a school administrative unit, SAU 70 owes a duty of reasonable supervision to each of its student within its district, including A.V.  SAU 70 is also a recipient of federal funds and is responsible for complying with all aspects of Title IX. SAU 70 is being sued both directly and based upon a claim of respondeat superior or vicarious liability for the unlawful conduct of Justin Campbell, the Principal of Hanover High School.

4. The Defendant, Justin Campbell (hereinafter "Principal Campbell") is the Principal of Hanover High School and, at all relevant times, was employed by SAU 70 and the Dresden School District.  As an administrator at Hanover High School, Principal Campbell has a duty to oversee, supervise and facilitate the daily operations of the school.  Principal Campbell also owes a duty of reasonable supervision to all students attending Hanover High School, including A.V.  Additionally, at all relevant times, Principal Campbell had an obligation to take reasonable steps to ensure that all students attending Hanover High School, including A.V., were being educated in an environment that was free of harassment and bullying.  Principal Campbell is being sued in his individual and official capacity.

### III.     JURISDICTION AND VENUE

5.  This action is being brought under Title IX, 20 U.S.C. § 1681, et seq. (hereinafter "Title IX"), 42 U.S.C., § 1983 and state common law.  Further, the Plaintiff is requesting reasonable attorney's fees pursuant to 28 U.S.C. §1988.  Therefore, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1343(a)(3), 1331 and 1367.

6.  Venue is proper pursuant to 28 U.S.C. § 1391 because the acts and omissions which give rise to this action occurred in this district and all Defendants reside in this district.

### IV.     FACTUAL BACKGROUND

7.  A.V. is a fifteen (15) year old student who attended Hanover High School as a freshman during the 2016 – 2017 school year.

8.  During the 2016 – 2017 school year, Dresden had a Sexual Harassment Policy and corresponding procedures for responding to complaints of sexual harassment.

9.  Dresden's Sexual Harassment Policy defined sexual harassment broadly and included verbal abuse or harassment, sexually suggestive or obscene material directed at another and unwelcome touching.

10. Dresden's corresponding procedures for responding to complaints of sexual harassment requires all school employees who know that a student is being sexually harassed to inform either the Principal or Title IX designee.

11. Once sexual harassment is reported, these procedures require administration to take the following actions:

   a.  Obtain a written statement from the victim;

   b.  Meet with the alleged offender;

   c.  Obtain a written statement from the alleged offender;

    d.   If the alleged offender confirms the allegations, sanction the offender;

    e.   If the alleged offender denies the allegations, conduct an investigation;

    f.   Issue written findings which will be maintained in the Title IX designee's confidential file;

    g.   Sanction the offender if the allegations are substantiated; and

    h.   Inform the victim of the finding.

12. Prior to attending high school, A.V. had experienced some bullying and sexual harassment during his eighth-grade year.

13. A.V. was also hazed, sexually harassed and sexually assaulted at a summer camp that he attended during the summer of 2016.

14. Specifically, during the 2015 – 2016 school year, at various times A.V. was called "gay," "pussy" and "a loser."  Rumors were spread about him being homophobic and making homophobic remarks.  He was kicked in the groin, pushed, had his pants pulled down, was hit in the head during lacrosse practice and was sworn at by fellow students.

15. During the summer of 2016, A.V. attended a summer camp with a number of other students from Hanover who also attended Hanover High School during the 2016 – 2017 school year.  He shared a room with three of these students, namely, Students A, B and C.

16. During the four days that A.V. attended the camp, Students A, B and C repeatedly assaulted him, both physically and sexually, hazed him and sexually harassed him. Specifically, some of the incidents that occurred over these four days were as follows:

    a.   They squashed bananas into his sleeping bag and bed;

    b.   They poured red Gatorade on his pillow and put a band aid on it, so it looked like blood;

   c.  One of them masturbated and ejaculated into A.V.'s towel;

   d.  They repeatedly masturbated in front of A.V. and made fun of him for not joining them;

   e.  Student B masturbated and ejaculated into A.V.'s swim trunks;

   f.  They repeatedly threatened to wipe their semen on A.V.;

   g.  Student C masturbated and after he ejaculated, he wiped his semen on A.V.'s face and arm;

   h.  Student A brought a vibrator and the students passed it around;

   i.  They pulled A.V.'s towel off of him, without his permission, exposing his genitals;

   j.  They hung A.V. upside down and repeatedly took turns hitting him and punching him;

   k.  Student B repeatedly punched A.V. until he agreed to play a "fight club" game;

   l.  They called him fat, talked about how big his stomach was and how he had no abs;

   m.  They made fun of him, saying that his "balls" must not have "dropped" because he would not masturbate with them;

   n.  They told him that he had a small penis;

   o.  They made derogatory comments about him not being circumcised;

   p.  They started a rumor around the camp that A.V. couldn't ejaculate because his "balls" had not "dropped;"

   q.  They told other kids at the camp that Student C had wiped his semen on A.V.'s face and arm; and

    r.   Student A sprayed sun screen and Old Spice up his anus while he was changing and leaning over to get clothes.

17. On or around August 30, 2016, A.V. started attending Hanover High School as a freshman.

18. On that day, a student sent A.V. a message asking him about the incident where Student C wiped his semen on him.  Two other students approached A.V. at school that day and asked him about the incident.

19. On or around September 1, 2016, Student B sent A.V. a message and threatened him not to talk about the incident.

20. Shortly thereafter, multiple students, including Students A and B, began referring to A.V. as "Little Dick" and "Little D."  During the course of the school year the number of students referring to A.V. as "Little Dick" and "Little D." increased and he was repeatedly called these names throughout the 2016 – 2017 school year.  This occurred on a near daily basis.  Other students that called A.V. these names included, but were not limited to, Students D, E and F.

21. As the fall progressed, multiple students also began calling A.V. "pussy," "faggot," "bitch," "cunt," "gay," "casper," "asshole," and "white girl."  Again, during the course of the school year, the number of students calling A.V. these names increased and he was repeatedly called these names throughout the 2016 – 2017 school year.  This occurred on a near daily basis.  Other students that called A.V. these names included, but were not limited to, Students D, E and F.

22. Student D, who constantly referred to A.V. as "Little Dick" and "Little D.," also repeatedly swore at him and recruited a friend to tell A.V. that Student D was going to kill him.

23. During that fall, Student D also repeatedly harassed and bullied A.V.

24. During one incident, Student D blocked the Mother's car and flipped them off as she attempted to leave the Hanover High School parking lot with A.V.

25. During another incident, Student D put a lock on A.V.'s bag.  A.V. could not remove the lock and had to have a janitor cut it off his bag with bolt cutters.

26. Furthermore, as discussed previously, Student D also repeatedly referred to A.V. as "Little D.," "Little Dick," pussy," "faggot," "bitch," "cunt," "gay," "casper," "asshole," and "white girl."

27. During this time period, students began shoving A.V. into the lockers in the hallway and began stealing things out of his bag.

28. On or around November 17, 2016, Student D grabbed A.V.'s head and slammed him into the corner of the piano located in the hallway.  A.V.'s Mother brought him to get medical attention.  As a result of this assault, A.V. had a large, swollen bump on his forehead, bruising and a concussion.

29. That day, A.V.'s father, C.V. (hereinafter "the Father") called Principal Campbell from the examination room, explained what happened and reported that A.V. had a concussion.

30. On or around November 18, 2017, the Father met with Principal Campbell to discuss the incident with Student D and A.V.'s injuries.

31. Later on that day, Principal Campbell emailed the Mother and informed her that Student D claimed that A.V. had created a persona for himself, called "Little D."  As part of this persona, Student D claimed that A.V. engages in name calling and swearing.

32. On or around November 19, 2016, the Mother responded to Principal Campbell and explained that A.V. did not create a persona, that the "d" in "Little D." stands for dick, that A.V. does not refer to himself as "Little D.," and that a number of students, including

Student D had been calling A.V. "Little D.," "Little Dick" and "pussy" all year. The Mother also reported that since this incident, other students were harassing A.V. for "snitching" on Student D. Principal Campbell never responded to this email.

33. During the week of November 21, 2017, the Mother and Father again met with Principal Campbell to discuss Student D's assault of A.V. and to explain to him that A.V. does not refer to himself as "Little D." or "Little Dick." The Mother and Father described the other incidents that occurred during this school year as detailed above and expressed their concern for A.V.'s safety at school. They did not discuss the summer camp incidents.

34. On November 28, 2017, the Father called and spoke with Principal Campbell to follow up on his investigation of the assault.

35. On or around December 1, 2016, the Mother emailed Principal Campbell to request a meeting to discuss the bullying and harassment. In the email, the Mother stated "I have concerns regarding [A.V.'s] safety and wellbeing both physically and mentally."

36. Later on that day, the Mother left messages for Principal Campbell to schedule a meeting with him to discuss the issues in her emails.

37. On or around December 7, 2016, another student, Student G, who is friends with Student D, pushed A.V. in the hallway and called him "a pussy." When A.V. tried to stand up for himself, Student G said "What? I can't hear you with that squeaky voice."

38. On or around December 8, 2016, the Mother emailed Principal Campbell's assistant requesting a meeting with Principal Campbell on December 12th to discuss the ongoing sexual harassment, bullying and assault.

39. Later on that day, Principal Campbell's assistant responded that Principal Campbell was out that day but to contact the office and schedule another time to meet with him.

40. On or around December 14, 2016, Student B and another student, Student H., shared a
    photograph of A.V. on Instagram, that was taken without his knowledge.  It showed A.V.
    walking in the school hallway, but it had been blown up and manipulated with the caption
    "Lost on the way to Montessori School."

41. On or around December 19, 2016, the Mother left a message to try and schedule a meeting
    with Principal Campbell to discuss the ongoing incidents described above.

42. On or around January 2, 2017, the Father left a message to try and schedule a meeting with
    Principal Campbell to discuss the ongoing incidents described above.

43. Sometime in January 2017, the Mother met with Principal Campbell to discuss the ongoing
    issues and all the incidents that occurred since the beginning of the school as described
    above.  Additionally, during the meeting, the Mother also told Principal Campbell that
    things happened at summer camp with a lot of these students, but it was not on school
    grounds.  Principal Campbell responded that there is nothing he can do when incidents
    occur off school grounds.  The Mother did not go into the specifics of the summer camp
    incidents.

44. On or around March 1, 2017, A.V. was sitting on a cafeteria style table with some friends
    sitting in front of him.  Unbeknownst to him, Student E, who had been calling A.V. names
    such as "Little D." and "Little Dick" all year, crawled under the table and drew two penises
    on the heel of his left boot using a black sharpie.

45. Later on that day, the Mother called Principal Campbell and spoke to him at length about
    the March 1st incident as well the ongoing issues described above.  During this discussion,
    Principal Campbell assured her that he was taking appropriate steps to address the incident.

46. On or around March 2, 2017, the Mother, Father and A.V. met with Principal Campbell to discuss the boot incident and the ongoing issues above.  They also brought the boot in to give it to Principal Campbell.  During this meeting, Principal Campbell told the family that this group of boys do these kinds of things to each other, but assured them that he was addressing the issues.  At the end of the meeting Principal Cambpell informed them that Student E would write A.V. an apology note and would reimburse him the costs of the boots.

47. On or around March 6, 2017, the Father called and spoke with Principal Campbell to follow up on their March 2nd meeting and to tell him that A.V. has not received payment for the boots or an apology note.

48. On or around March 8, 2017, while A.V. was traveling with his family, Student I sent a video to A.V. showing students lining up to take a photo in front of a poster.  As part of a school project, Student E made a poster using a picture of A.V. that had been taken from his social media account, without his consent.  The pictured was from a few years ago and A.V. was shirtless.  The image was then manipulated to give A.V. small arms and was superimposed over the image of a weight room. Student E was then allowed to hang this poster in the school cafeteria.

49. On or around March 21, 2017, upon returning to school after traveling with his family, A.V. located the poster of himself in the school cafeteria.  After he took the poster down from the wall, Student J attempted to take it from him and the poster was ripped up.  A.V. picked up the ripped up pieces and brought them home to show his family.

50. Later on that day, the Mother emailed Principal Campbell to tell him about the incident. In her email to him, she told him that photos of the poster were all over social media and stated as follows:

    a. "This is [Student E.] again…. Same kids. Again. We cannot protect him at school."

    b. "I'm ready to pull him out. I will not have him effected so deeply that he cannot focus at school and this is the reality now."

    c. "Please call me to update me on what happened with [Student E]. [A.V.'s] Timberlands? It snowed, he has no snow shoes."

    d. "[A.V.] starts lacrosse and I'm really worried for his safety. One of the kids involved is [on] the team and has already been knocking him around. I cannot put into words how concerned I am."

51. Later on that day, the Mother emailed a photograph of the poster to Principal Campbell.

52. On or around March 22, 2017, Principal Campbell called the Mother to discuss the poster incident and suggested having Licensed Mental Health Clinician, Chris Seibel (hereinafter "Mr. Seibel") meet with A.V. The Mother agreed and, again, she spoke with Principal Campbell about the ongoing issues, explaining that they were all connected. During the call, the Mother explained that multiple students posted pictures of the poster on social media, including Student K.

53. Later on that day, the Mother emailed Principal Campbell to follow up on their earlier telephone call. In the email, the Mother informed Principal Campbell that "[A.V.] thinks this is uncontrollable.... He is 100% convinced that this is his life until graduation."

54. On or around March 23, 2017, the Mother emailed Principal Campbell.  In the email she expressed her concern because the incidents seemed to be escalating.  In the email, she reported that Student K said that if he got in trouble, he would "kick [A.V.'s] ass.  This is the kid on [A.V.'s] lacrosse team who has already been rough and has [put] hands on him in middle school.  He threw him across the gym floor…. So today I am worried to send [A.V.] to practice…. I don't want to let them take this away from him, but I can't risk him having another concussion or worse."

55.  Between March 23, 2017 and March 27, 2017, the Mother left three messages for Principal Campbell to follow up with him regarding the issues raised in her recent emails.

56. On or around March 31, 2017, the Mother emailed Principal Campbell because she had not received reimbursement for A.V.'s damaged boot.  Principal Campbell responded saying, "I believe the check arrived and is in my office.  I will send it home with [A.V.] on Monday."

57. Later on that day, the Mother and Father went into Principal Campbell's office to collect the check and apology note.  However, Principal Campbell had neither.

58. On or around April 1, 2017, the Mother emailed Principal Campbell to inform him that a picture of the poster of A.V. was hanging up on a school bulletin board.  She said that the picture is of students proudly displaying their March intensive projects.  This included Student E holding his poster of A.V.

59. On or around April 3, 2017, the Mother met with Principal Campbell to discuss the photo of the March Intensive poster of A.V. and the ongoing issues.

60. Later on that day, while A.V. was at lacrosse practice, Student K came across the field and knocked A.V. to the ground.  A.V. got up and pushed him to get the ball and then Student

K punched him at least once on the right side of his head.  The coach and the Father witnessed this incident.  After the incident, A.V.'s ear was ringing and he could not hear what the coach was saying.

61. On or around April 4, 2017, while A.V. was in the hallway at school, Student B showed A.V. pictures on his phone he had downloaded from the Mother's Facebook page without anyone's permission.  Student B mocked him saying, you looked a lot different when you were little.

62. On or around April 5, 2017, Student A tossed an envelope at A.V. and said, "Open it, I want to see it. It's a dick and I want to video it."  A.V. said no and walked away.  When A.V. opened the envelope, he saw that it contained the check and apology letter from Student E that he was supposed to give to him because of the March boot incident.  Prior to getting the apology note, Student E and other students repeatedly told A.V that he was never going to get this money.  Student E also repeatedly texted A.V. to ask what boot size he wore.

63. On or around April 6, 2017, Student A was standing in a large group of kids in front of A.V. and was showing the pictures that Student B had forwarded to him from the Mother's Facebook.  The kids were making fun of him and laughing at him.  A.V. recorded this incident on his cell phone and the Mother forwarded the video of the incident to Principal Campbell via email later on that day.  Principal Campbell did not respond to the Mother's email.

64. On or around April 7, 2017, the Mother met with Mr. Seibel to discuss the ongoing issues detailed above.  During the meeting, the Mother told Mr. Seibel that A.V. was sexually assaulted at lacrosse camp over the summer and gave him the police report number.

65. Later on that day, Mr. Seibel met with A.V. to discuss the ongoing issues detailed above. During the meeting, Mr. Seibel asked A.V. which students he had roomed with at lacrosse camp.  A.V. told him that he had roomed with Students A, B and C.

66. Later on that day, Principal Campbell spoke with an officer at the Hanover Police Department regarding the issues that had been ongoing all year.  As noted in the police report, "[Principal Campbell] explained that most of the issues stemmed from a verbal altercation back and forth from A.V. and the individuals stated above.  [Principal Campbell] said that A.V. pokes the bear and entices the behavior or bullying."

67. Later on that day, Principal Campbell emailed the Mother and requested to schedule a meeting.  As outlined by Principal Campbell, the meeting agenda was to discuss the following items:

    a.   Clarify school-based supports and procedures for A.V.;

    b.   Suggest community resources, if needed; and

    c.   Address past and current discipline concerns.

68. On April 10, 2017, the Mother, the Father, A.V.'s grandfather (hereinafter "the Grandfather"), Principal Campbell and Mr. Seibel met to discuss the ongoing issues and ways to address the incidents.  During the meeting, the Mother provided a list of all the students that had been involved in every school incident detailed above.  During the meeting, the Grandfather explained to Principal Campbell that these incidents were not isolated, but were all related and part of an overarching hostile school environment.

69. On April 11, 2017, Principal Campbell emailed the Mother and said that he took the following actions:

    a.   Met with Superintendent Frank Bass (hereinafter "Superintendent Bass").

    b.   Met with Dean of Students, Julie Stevenson (hereinafter "Ms. Stevenson").

    c.   Followed up with the students that the Mother listed yesterday and also reached out to their parents.

    d.   Spoke with students and gave them clear behavioral guidelines going forward.

    e.   Asked other students outside of the immediate group about their observations.

    f.   Connected with the JV lacrosse coach.

    g.   Asked teachers to keep an eye on A.V. and report any instances of students treating him poorly.

70. Later on that day, Mr. Seibel emailed the Mother and notified her that he had met with A.V.

71. On or around April 13, 2017, the Mother spoke with Principal Campbell regarding his email, the ongoing issues and to schedule a meeting.

72. On or around April 14, 2017, the Mother spoke with Principal Campbell about scheduling a meeting to discuss the findings of his investigation.

73. On or around April 24, 2017, Principal Campbell emailed the Mother and Mr. Seibel, and explained that he needed to reschedule their meeting because he was out sick.

74. On or around April 26, 2017, the Mother called Principal Campbell to discuss his investigation, the ongoing issues and requested to reschedule the meeting.  A meeting was scheduled for April 28, 2017.

75. Later on that day, the Mother emailed Principal Campbell, requesting to reschedule the meeting and asking for a copy of his investigation report in advance of their meeting.  In response, Principal Campbell stated that he would rather go over it in person.

76. On or around April 28, 2017, the Mother spoke with Principal Campbell to discuss his investigation, rescheduling the meeting and again requested a copy of his investigation report prior to their meeting.  During the conversation, Principal Campbell told the Mother that he was not allowed to give her a copy of his findings and that it would be best to go over them in person.  Ultimately, a meeting was rescheduled for May 8, 2017.

77. On or around May 8, 2017, the Mother met with Principal Campbell and Ms. Stevenson to discuss the results of Principal Campbell's investigations.  Prior to the meeting, the Mother wrote a lengthy letter to Principal Campbell detailing every incident described above, including the sexual assaults and harassment that occurred during the summer.  The letter also listed every student involved in the incidents.

78. Upon reviewing Principal Campbell's report, which was addressed to Superintendent Bass, it became clear that he had not investigated all the issues reported by the Mother and Father.  For example, the letter did not address any of the names that A.V., the Mother and the Father repeatedly reported to Principal Campbell.  This included "Little D.," "Little Dick," "pussy," "faggot," "bitch," "cunt," "gay," "casper," "asshole," and "white girl."

79. Similarly, Principal Campbell did not investigate the poster incident where Student E, as part of a school project, manipulated an image of A.V. in an attempt to emasculate him and was then allowed to hang this poster in the school cafeteria for at least a week.

80. Moreover, it does not appear that Principal Campbell fully investigated the allegations raised.  For example, in emails to A.V.'s teachers, Principal Campbell simply asked them to describe A.V.'s interactions with his classmates.  It does not appear that he notified any of A.V.'s teachers or coaches about the specific incidents that A.V., the Mother or the Father reported.  Similarly, it does not appear that he asked any staff members or students

if they heard any of students reported calling A.V. "Little D., "Little Dick," "pussy,"

"faggot," "bitch," "cunt," "gay," "casper," "asshole," or "white girl."

81. Instead the report focused on A.V. and that other students found him to be annoying, rude and mean.

82. On May 9, 2017, the Mother, A.V.'s grandmother (hereinafter "Grandmother") and A.V. met with Ms. Stevenson to discuss the ongoing issues and to develop a safety plan. Prior to the meeting, the Mother wrote a letter to Principal Campbell and Ms. Stevenson about the tenor of the investigation report, which she read to Ms. Stevenson. The Mother stressed that she was very concerned that Ms. Stevenson was unaware of these ongoing issues until the day before. They also began working on a safety plan, which would include a list of students that would not be in A.V.'s classes for the 2017-2018 school year. Other services that were offered to A.V. as part of Principal Campbell's investigation and/or during this meeting were as follows:

    a. An adult to shadow A.V. throughout his day;

    b. Regular counseling services with either Mr. Seibel or the School Psychologist; and

    c. Consultation with a speech and language therapist to target social behavior mapping.

83. Principal Campbell also stated that all teachers and coaches would vigilantly monitor behaviors in class and they would immediately report concerning behaviors to either Principal Campbell or Ms. Stevenson.

84. After this meeting, the Mother asked to meet with Superintendent Bass. The Mother gave him the letter that she read to Ms. Stevenson, gave him a summary of the harassment and

bullying issues that had been going on all year and gave him a copy of Principal Campbell's investigation report. Although the investigation report was addressed to Superintendent Bass and was dated April 11th, he indicated that this was first time he was seeing it, asked for a copy of the report and said he would look into the issues.

85. Later on that day, after a lacrosse game, Student F began swearing at A.V. in the bleachers and put A.V. in a headlock. Another student intervened after A.V. was in a headlock for approximately 30-45 seconds. After this, A.V. went into the boy's locker room to get his bag to leave. While in the locker room Student F cornered him, put him in a headlock and repeatedly hit him in his head and his abdomen with his hands, his elbows and with a metal object. At some point, A.V. was cut and he bled on his clothing and his lacrosse bag. Student E recorded a portion of this incident and posted it on social media.

86. Following the incident, the Mother and Father brought A.V. to the police and fire station, where he was evaluated by the paramedics and filed a police report. They also made a police report and then brought A.V. to the emergency room for treatment, where he was diagnosed with a closed head injury. Shortly thereafter, A.V. was diagnosed with a concussion. A.V. also had bruising on his neck and abdomen and lacerations.

87. A.V. did not return back to school following this incident and was placed on medical leave.

88. On or around May 22, 2017, the Mother and Father requested that A.V. be reassigned to a different school under either RSA 193:3(I) or RSA 193:3(III).

89. On or around June 19, 2017, Superintendent Bass wrote the family and informed parents that he was recommending that A.V. be granted reassignment under RSA 193:3(III) so that he could "have a fresh start and form new peer relationships."

90. Since this time, A.V. and his family moved out of state.

## V.     CLAIMS

**COUNT I**
**Title IX Violation**
**Sexually Hostile School Environment**
**Against Dresden School District and School Administrative Unit 70**

91. The Plaintiff realleges paragraphs 1-90 above and incorporate them herein.

92. Title IX and its implementing regulations prohibit discrimination in educational

    programs, operated by federally funded recipients, on the basis of sex.

93. Under Title IX, a recipient is defined as any state or political subdivision, any

    instrumentality of a state or political subdivision, any public or private agency,

    institution, organization, entity or any person that receives federal funds either directly or

    through another recipient, and that operates an education program or activity. 34 C.F.R.

    § 106.2(h).

94. When a recipient school district becomes aware of ongoing acts of student-on-student

    sexual harassment and the student perpetrator is under its disciplinary policy, it is required

    to take action. *Davis v. Monroe Cnty Bd. of Educ.*, 526 U.S. 629, 647 (1999).

95. A recipient school district's failure to act constitutes deliberate indifference when its

    response is "clearly unreasonable in light of the known circumstances." *Grant v.

    Wallingford Bd. of Educ.*, 195 F.3d 134, 141 (1999).

96. Additionally, when a recipient school district learns that its actions proved ineffective to

    prevent further harassment, it must take additional reasonable steps in light of the known

    circumstances.  *Id.*

97. All harassment is not actionable under Title IX.  Rather the harassment must be "so

severe, pervasive and objectively offensive" that it prevents its victims from accessing

the educational opportunities and benefits provided by the recipient school district.  *Id*. at

650.

98. Same-sex harassment is actionable under Title IV.  *See Ricco v. New Haven Board of*

*Education,* 467 F.Supp.2d 919, 225 (D.Conn. 2006), citing to *Oncale v. Sundowner*

*Offshore Services, Inc.,* 523 U.S. 75 (1998), where the "Supreme Court describe[d] an

actionable same-sex harassment scenario in which a female employee harasses another

female employee with sex-specific derogatory language based on a general hostility to

women in the work place."

99. Similarly, sex-stereotyping claims are recognized under Title IX.  *See Pratt v. Indian*

*River Cent. School Dist.,* 803 F.Supp.2d 135, 151 (N.D. New York 2011).

100.  This includes claims that the harassers believed that the victim "did not conform to

male stereotypes… i.e., that he did not act as a man should act."  *Theno v. Tonganoxie*

*Unified School Dist. No. 464,* 377 F.Supp.2d 952, 965 (D. Kansas 2005).

101.  Additionally, incidents may appear to be facially neutral abusive conduct, however,

they "can support a finding of gender animus sufficient to sustain a hostile [school]

environment" when a reasonable jury could infer that the abusive conduct was also

gender-based. *Chavez v. New Mexico*, 397 F.3d 826, 833-837 (10th Cir. 2005).

102.  Here, the Plaintiff A.V. was repeatedly subjected to sexual harassment based upon his

harassers' perception that he did not conform to male norms.  As detailed above, this

included, but was not limited to, comments about the size of his penis, insults about his

sexual orientation, insults about his gender, having a poster, which emasculated him,

hung up on school property for extended periods of times and having penises drawn on

his boots.

103. A.V. was also subjected to abusive, but facially neutral conduct, which was motivated by his alleged failure to conform to gender norms.  As detailed above, this included, but was not limited to having a lock placed on his backpack, being repeatedly and seriously physically assaulted, being shoved into lockers and repeatedly mocked, threatened and taunted.

104. This harassment was so severe, pervasive and objectively offensive that it prevented A.V. from accessing the educational opportunities and benefits provided by Hanover High School and, ultimately, the parents requested, and were granted, reassignment so A.V. could "have a fresh start and form new peer relationships."

105. A.V. and his family repeatedly reported these incidents to the Defendants.  However, the Defendants failed to appropriately investigate the incidents and take reasonable steps in light of the known circumstances to stop the harassment.

106. Moreover, when the Defendants learned that their actions were ineffective, they failed to take further reasonable steps.

107. The Defendants acted with deliberate indifference to the known acts of sexual harassment described in the herein complaint.

108. As a result of the Defendants' repeated failures to appropriately investigate the incidents of sexual harassment, take appropriate action to address the sexual harassment, prevent reoccurrence, or address the effects that it had on A.V., he was unjustly, and on a discriminatory basis, denied access to the educational opportunities and benefits provided by the Defendants.

109. As a result of Defendants' repeated failures to appropriately investigate the incidents of

sexual harassment, take appropriate action to address the sexual harassment, prevent

reoccurrence, or address the effects that it had on A.V., he suffered and will continue to

suffer from psychological harm, emotional harm and physical injury, pain and suffering

for which they are liable.

## COUNT II
## 42 U.S.C. § 1983
## Against All Defendants

110.  The Plaintiff realleges paragraphs 1-109 above and incorporate them herein.

111.  42 U.S.C. § 1983 provides a cause of action for the deprivation of any rights, privileges

or immunities secured by the Constitution and laws by any person acting under color of

law.

112.  A school district will be held liable if an official policy causes a person to be deprived

of any rights, privileges or immunities.  *Connick v. Thompson*, 563 U.S. 51, 60 (2011).

113.  This includes decisions by lawmakers, acts of policymaking officials and "practices so

persistent and widespread as to practically have the force of law."  *Id.* at 61.

114.  It also includes the "decision not to train certain employees about their legal duty to

avoid violating citizen's rights" when this decision amounts to deliberate indifference.  *Id.*

115.  Specifically, "when [policymakers] are on actual or constructive notice that a particular

omission in their training program" has led to a violation of students' constitutional

rights, school districts will be deemed to have acted with deliberate indifference.  *Id.*

116.  Additionally, school districts will be held liable when it "can be said to be so obvious

that failure to [train] could be properly characterized as deliberate indifference."  *City of

Canton, Ohio v. Harris* 489 U.S. 378, 390, n. 10 (1989).

117.  The Plaintiff A.V. had a constitutionally protected right to attend school free of sexual

harassment under Title IX.

118.  During the 2016 – 2017 school year, the Defendants had both a Policy on Sexual

Harassment and corresponding procedures for responding to complaints of sexual

harassment.

119.  Neither document adequately describe the Defendants obligations under Title IX or the

actions that needed to be taken when incidents of sexual harassment are reported.

120.  As a result, during the 2016-2017 school year, the Defendants did not have an adequate

Title IX policy.

121.  The Defendants did not follow either the Sexual Harassment Policy or corresponding

procedures.  Specifically, the Defendants failed to follow them as follows:

     a.  Identify the incidents as allegations of sexual harassment;

     b.  Obtain written statements from A.V. or the harassers; and

     c.  Inform A.V. and his parents of the findings.

122.  Moreover, it remains unknown whether the Defendants investigated all of the incidents,

notified the Title IX coordinator and if they maintained a record on the finding in the Title

IX coordinator's file.

123.  Upon information and belief, the Defendants' failure to adhere to Title IX was due to

the Defendants' failure to train.

124.  Upon information and belief, there have been other known incidents of sexual

harassment that put them on notice that training on Title IX was required.

125.  Upon information and belief, the Defendants failed to train following these other known

incidents of sexual harassment, which amounts to deliberate indifference.

126.  Additionally, it is so obvious that failure train administration on the Defendants'

obligations under Title IX would result in violations of Title IX.

127.  As a result of the Defendants' failure to train, the Plaintiff A.V. was unjustly, and on a discriminatory basis, denied access to the educational opportunities and benefits provided by the Defendants.

128.  As a result of Defendants' failure to train, A.V. suffered and will continue to suffer from psychological harm, emotional harm and physical injury, pain and suffering for which they are liable.

129.  The Defendants conduct constituted reckless or callous indifference to A.V.'s federally protected rights and, as a result, A.V. is entitled to punitive damages.

**COUNT III**
**Negligence**
**Against Justin Campbell**

130.  The Plaintiff realleges paragraphs 1-129 above and incorporate them herein.

131.  The Defendant had a duty to provide A.V. with an educational atmosphere free from sexual harassment.

132.  The Defendant also had a duty to reasonably supervise A.V. and all students within his care.

133.  The Defendant breached these duties when he failed to (a) reasonably supervise A.V. and his harassers; (b) appropriately investigate A.V's reports regarding sexual harassment; (c) take appropriate action to address A.V.'s reports; (d) prevent reoccurrence of sexual harassment; and (e) address the effects that the harassment had on A.V.

134.  In breaching these duties, the Defendant failed to act in good faith.

135.  As a direct and proximate result of the Defendant breach of these duties, A.V. has suffered and will continue to suffer from psychological harm, emotional harm and

physical injury, pain and suffering for which they are liable.

136.  The injuries, damages and harm that A.V. suffered were reasonably foreseeable to the Defendant.

137.  The Defendant's actions constitute gross negligence in that he acted with reckless disregard and, as a result, A.V. is entitled to enhanced compensatory damages.

## IV.    ATTORNEYS FEES

138.  Pursuant to 28 U.S.C. §1988, the Plaintiff is requesting an award of reasonable attorney's fees.

## V.    JURY DEMAND

139.  The Plaintiff demand a jury trial.

## VI.    PRAYER FOR RELIEF

WHEREFORE, the Plaintiff pray for the following relief:

i.   Enter a declaratory judgment that the conduct set forth above is unlawful and in violation of state and federal law;

ii.   Enter judgment in the Plaintiff's favor on the claims against the Defendants, the exact amount to be proven at trial;

iii.  Award the Plaintiff damages to compensate them for the injuries he suffered and will continue to suffer as a result of the Defendants' unlawful conduct, the exact amount to be proven at trial;

iv.  Award the Plaintiff enhanced compensatory damages, the exact amount to be proven at trial;

v.   Award the Plaintiff punitive damages, the exact amount to be proven at trial;

vi.  Award the Plaintiff reasonable expenses incurred in this litigation, including attorney

and expert fees and costs; and

vii. Grant any other relief that this Court deems just and equitable.

Respectfully Submitted,

*/s/ Karen E. Hewes*
Karen E. Hewes (# 20095)
EdLaw New England, PLLC
khewes@edlawne.com
50 Bridge Street, Suite 203
Manchester, NH 03101
(603) 695-6557
(603) 695-6558

**ATTORNEY FOR THE PLAINTIFFS**

January 26, 2018